on behalf of Mr. Banks, Mr. Derek F. Reinhardt, on behalf of the people of the district of Bethel Park. Thank you. Mr. Reinhardt, you may proceed. Good morning. Good morning. May it please the Court, the conviction in this case cannot stand as it arises out of a flagrant violation of due process that might have been a clear Stavinsky violation and, as importantly, was derived from a clear violation of the Illinois eavesdropping statute. As if this were not enough, there were critical discovery violations that were discovered or uncovered only through trial itself. And finally, at the end of the case, there was the imposition of the trial tax. Counsel, why was the trial court's finding here that there was no express agreement against the manifest weight of the evidence? Well, respectfully, I think the trial court's finding, if we look at what the Court actually said, it did find that there was an agreement between the parties, between Mr. Banks and law enforcement. I think the confusion, and I say this respectfully to the trial court, was that there wasn't an express promise of dismissal or, really, I should say non-prosecution. And if I say dismissal, I actually mean non-prosecution. The allegations or the acts occurred between January of 2017 and March of 2017, and so  I think the trial court is saying there was no express promise of non-prosecution or immunity. The trial court said law enforcement, and I'm reading directly from the trial court now, and the State concedes this, law enforcement had entered into an agreement with the defendant to serve as a confidential source, that the expectation and understanding was that the less clearly identified at equal or greater levels, so to speak. So and that's from 308, 309 in the record. So the trial court actually found an agreement, and in the trial court, the parties argued, and I was trial counsel for Mr. Banks, the parties argued that he was expressly promised immunity, and what the trial court found was that there was not such an express promise of immunity. And what actually happened, when you read the record, is that the parties went back and forth over whether or not the phrase working off charges, this phrase working off charges, whether it meant non-prosecution or immunity, or whether it meant something else. Like I'll talk to the prosecution for you. Exactly. Right. So those may be two different things. Yes, I totally agree, Justice, and I think that's a critical distinction that it's good to talk about now. And I think that the trial court was finding that there was no express promise to dismiss the case. But all of the other evidence around, through their actions, through their forbearance, through their reliance upon each other, was that Jason would at least be able to work on his part of the cooperation agreement. And Justice, you know, what did not happen was that call, that communication between the police and the State's Attorney's Office, never happened because they arrested Jason merely days after his most successful operation. And so even if, by the way, Justice, my position was and is that there was an express promise of dismissal, that what I call in the briefs the Banks-Teshner agreement, and Teshner is the handler, and that's critical to the facts of the case. And this is a little bit of a factually intense appeal. The Banks-Teshner agreement postdates the sit-down with the DEA and with Pulaski. Pulaski... Well, does the DEA agent who actually comes in and has the agreement signed ever use the terms working off or you won't be charged, or is that a Teshner term? So Lancaster himself, in the trial, did use that phrase. Lancaster himself said, this is on page 1002 of the record, Lancaster says, it would have depended on whether... This is page 35 of my brief, and I don't mean to read from my brief, but Lancaster said, it would have depended on whether he agreed to sign up as an informant on one of those charges that got charged that day. They're speaking about the arrest in March. And the assistant state's attorney says, if he was going to work as an informant, you were not planning on charging him, and Lancaster says, correct. So DEA, even the DEA understood the phrase to be that he would not be charged. Teshner himself, the sort of handler, the guy on the street, the guy that Jason's working with most of the time, testified at the hearing that he understood the phrase working off to be a dismissal. But he also testified, too, did he not, that it also, he also meant that he would talk to the prosecution. So he was not exactly clear about what the agreement was, was he? I think, well, Pulaski, who was the supervising agent, talked about how that would be up to, and he uses the first name of the supervising state attorney. Yes, now Judge Matthews in Lake County, he speaks about, he speaks about how the understanding was, at least, that Jason would do his work, and then they would speak to the state. And the Pulaski testimony is very critical, because he then says that the supervising state's attorney would then decide whether or not to bring charges at all, or whether there would be something less. But here's what's critical, Justice. That didn't happen either. And so I will confess, the argument in the trial court focused on whether or not it was full immunity that was promised, or something else. But let's take the state's best case, or the trial court's best case. Let's say there wasn't an express promise of dismissal. Wasn't there a promise of something? Wasn't there a promise of at least a reduction in criminal liability? Isn't that exactly what Pulaski said, which was that we would talk to the supervisor and say, well, this is what the guy did, and maybe the state's attorney's office would choose not to charge it, or maybe there would be something, I think he uses the phrase, something less. So if we accept even that, even if we accept that it was something less, when did Jason get to something less? He couldn't, because when he arranged for the bust or the setup of a man named Mallard. Mallard was arrested and busted on Jason's work in, I think, early April of 2017. They continued their contact, they worked on a second target, and the arrest warrant was issued by April 24th, 2017. Jason's own case took months to investigate. Jason's own case, the case that he was actually convicted of, took from January to April. Well, one of the reasons that, and we've heard this in many arguments where we've had similar situations, is the charges are not placed against the confidential party, so that people don't know that he has been arrested, or she has been arrested. And in today's world, where you can go into the clerk's office and pull up a name, you can see if somebody's been arrested and what for. So this is a way to protect the informant. And so your argument that we can tell by their forbearance, and now your argument that it doesn't make any sense in light of the fact that they're trying to protect their informant. I misspoke there. My point was, I should have said it more simply. Drug investigations take months, and this very case took months. And all I'm commenting on is, Jason did a successful bust in, I believe, early April of 2017, and by, they then broke the contract. They then violated the contract just within a matter of weeks. So I agree with the framework you're proposing, which is that this has to be kept confidential. But what I mean is that there was never a deadline imposed on Jason. There was never any statement that said, by May 1, 2017, we need to see three busts, or we have to do this. Well, there was never any time frame, but he indicated, did he not, that he couldn't do any more, because they all knew who he was. So that he could not complete his end of the bargain, so to speak. Respectfully. He indicated that he needed things to die down, and that's exactly what Teshner said. Teshner said he wanted things to die down, and there was never any testimony as to why this particular operation, or they couldn't have used him in a different way, or they couldn't have used intelligence from him, or they couldn't have used him in a few months. The phrase that Teshner, and we focused on this in the trial court, was that things needed to die down, but not that Jason was giving up on the contract or renouncing it. And I actually think, Justice Enoff, you've identified the exact thing that went wrong in this case. Teshner understood that if Jason wasn't going to be useful, they could bring the chargers. And what's critical is that Jason didn't renounce the contract, he didn't get arrested, he didn't shoot somebody, he didn't do something that violated his end. He said, I needed things to die down. And the reason that this is a due process violation, and a Stapitsky violation, is because Jason gave them information, he gave them statements, he gave them intelligence. How do you go back and try to negotiate with a state's attorney, or the DEA, or the Illinois State Police, after you've already shown that you can get more people? Hasn't he completely revealed himself and exposed himself as somebody who is still involved in the drug trade, and somebody who can still get other people? And so once he goes down that road of getting Mallard, of identifying Tracy, of talking to them about what he knows, he even talked about how much supply he was able to bring in. Once he did all of that, he has relied upon it, which is exactly what we see in Stapitsky. What's different in Stapitsky is that in this case, they just arrested him in the middle of the cooperation. And the only reason I was talking about that number of months was, I'm just saying it's short, right? Mallard's arrested in March, I think it's March, to be fair, I think it's late March. Mallard's arrested in late March of 2017, and by less than 30 days later, they've decided they're done with Jason. He didn't renounce the contract, he didn't violate the contract, he didn't block it, he didn't do anything except say, I need this to die down. And Teschner was fine with that. That's what is critical. And it is Teschner's, it is Teschner's understanding, well, since I can't use this guy or don't want to use this guy anymore, I can bring the charges whenever I want. And that's the Stapitsky violation. Is there any reason why they didn't place the same devices in his car that was placed in Botsko's, I think, car and, or stall or delay the arrest of Mallard so that he would not be made or he would not be identified? That's a good question. I don't know the answer. I don't know the record did not develop, or the trial court did not develop in the trial court the procedures they took to maintain Jason's confidentiality. I really, I would want to be very careful in speaking on it because I recall things, but that's, you know, that's because I'm trial counsel. But my recollection is that it was a typical, it was a typical buy bust. And my recollection is, to answer your question, Justice, is that they didn't take any unusual measures to protect Jason's identity. I will say, it is my understanding, and there's certainly no evidence in the record, that the Mallard bust involved any of the same devices that the Botsko, later on, that the Botsko situation involved. Frankly, that's because the federal agents were using this, you know, using the devices in Botsko's car. And that, you know, that leads to the second point in the appeal, which is that we have this, we actually have Kenosha working together. We have Kenosha and the Illinois State Police and the DEA all working together, but we don't have any authorization, we don't have any authorization for the overhears. And that leads to whether the evidence can be brought in a state court. And I think what's critical in this case is that there was a violation of the Illinois eavesdropping statute. Not the Fourth Amendment, not the Constitution, but the Illinois eavesdropping statute. And what the state could never adduce in this case, and frankly didn't even try in the pretrial proceedings, was that authorization. Why did we get around the eavesdropping statute? I filed a straightforward motion that said, where's the, where's the 108A or 108B authorization? If Roscoe consented to the placement of the paraphernalia, does your argument become unstable or deficient? No. You mean if this Court finds that she did consent? If she consented, yes. Yes, but she unequivocally did not consent. And it's probably the big respect for the trial court. It's the biggest error in this case, in terms of, if we're weighing different types of errors, it's the biggest error in this case. Roscoe said she didn't know about it. She didn't know about it in advance. Lancaster himself said I didn't. Lancaster's the DEA agent. Lancaster himself said I didn't tell her about it. She said I didn't know about it. She did not consent to something she didn't know about. And the state did not respond to any of the consents. So your syllogism is, there was no informed consent. Correct. She. She didn't consent to having her car wired? No, absolutely not. She didn't sign the consent form that seems to indicate that. No. No, the consent form that she signed, People's Exhibit 38, is a statement about the activities we're going to engage in. And this is so critical. The phrase in People's Exhibit 38 is, we are going to engage in you with the consensual wearing of devices. We may do, it says we may do this. But why would that be prospective consent for a car? You wouldn't use the word consensual again. If you imagine, if I may have a, if you can imagine the moment of a federal agent approaching BROTSCO and saying, okay, part of the activities you said you would engage in is I'm now going to place a device on you. And I'm not trying to make a fine distinction between wearing something and it being in a car, except that it informs that document. It says, you may also engage in the consensual wearing of a device. Now imagine a federal agent wiring somebody up. That's a different moment. If I'm putting something on your body, we're consenting about it, we're talking about it. That is a far cry from devices that we're not even talking about in a vehicle. That document is not consent for devices in a car in the future. It's saying we may walk up to you one day and try to put something on you. I don't even know if that's consent because it uses the word, I don't know that the document is prospective consent for that because it uses the phrase consensual again. So there seems to be a future moment that's contemplated. We're walking up to you, we're going to put a device on you, do you consent? That is very different from a car. So respectfully, the trial court's biggest factual mistake, I guess it's legal also, is that finding of consent because BROTSCO didn't know about it and the document that Justice McClaren referred to is not a document about the cars. Obviously, I have many other issues in the brief, but I reserve the balance of my time for rebuttal. Thank you. Thank you. You'll have an opportunity to make rebuttal. Ms. Burns, you may proceed. Good morning, your honors. Can I please have support? My name is Mary Beth Burns and I represent the people of the state of Illinois. We come before you this morning to respectfully ask this court to affirm the defendant's convictions and sentences. Initially, as to the first argument, defense counsel talked about the defendant being arrested shortly after his first successful operation, or his most successful operation. It was, in fact, his only successful operation. At the point of his arrest in, I believe it was mid-March, he told the DEA agent Lancaster and the MEG agent Pulaski that he could deliver his two main suppliers, both of whom were apparently fairly well-known drug dealers in Lake County. As soon as he started working with his handler, Detective Teschner, he basically said that that would not be possible, but that he would be able to deliver handlers. Or, I'm sorry, deliver runners. The first one did not pan out, this was a woman. The second one was Mr. Mallard, who didn't pan out. After Mr. Mallard's arrest, the defendant told Detective Teschner that it was known on the street that he had popped Mallard and that, therefore, he would not be able to assist. Shortly thereafter, there was continued communication between the defendant and Detective Teschner. However, at some point within a week or so, that communication dried up. Was it that- How did the discussion about, let's let things die down a little bit, or did that discussion actually happen before the communication dried up or after? I believe before. All right, and- And I believe that the way, if my recollection from the record is that they, the defendant used the word that they knew he had popped Mallard. And that, again, immediately after Mr. Mallard was arrested, the defendant and Detective Teschner continued to communicate. But then about a week or two afterwards, the communication somewhat dried up. And it was at that point Detective Teschner talked to Agent Lancaster and they agreed that they had to go to the state's attorney's office to get an arrest warrant for the defendant. And I guess that they believed at that point that because he was no longer initiating communication, that he was no longer going to be able to fulfill the agreement. To the extent that there was an agreement, and Judge Shaines kind of vacillated between believing there was an agreement or whether there was not an agreement. Because he ultimately concluded that law enforcement's view of the agreement and the defendant's views of the agreement were not particularly consistent. And he ultimately determined that taking the defendant's view, that's legitimately what the defendant believed it was, that his belief was not reasonable. He said the way these things typically operate, you have to bring in at least two or three other targets, and they have to be at amounts that are at least as much as what you were facing. And in general, what they wanted were targets who were at a higher level than the person himself. All right, he was looking at someplace between 15 and I think what, 20, maybe 29 was the highest in his, or 20 was the highest? I believe so. So, it then boiled down after the deal with Tracy fell through, because she never showed up allegedly, that okay, so give us a big one. He gave him 100 to 150 with Mallard. Why doesn't that count? Which would have been about the amount of the, he was at that point facing six deliveries. And this would have been about the aggregate amount of that. And so, it would have been not at a greater level, but it would have been a greater level than any one of them. But as to what he was facing in the aggregate, it would have been about the same as what he was facing. But didn't they both agree, that is, the defendant and law enforcement, that there was no time frame placed on this, on his obligation to come up with that? I don't believe that anybody ever discussed whether there would be a time limit. And I don't believe- I thought the record reflected that there was, that they never discussed a time limit. I don't believe the notion of a time limit, either a short time or a long time, was ever discussed. I don't know that a limitation on time was discussed. I think what was discussed was the nature of the defendant's communication and what the defendant could deliver. And I think that, then I believe that that was basically what the core of the discussions were about. So they each made erroneous assumptions, that is, the defendant and the law enforcement, with respect to time law enforcement, saying he can't deliver, so we're not going to wait, and we're gonna go get an indictment and, or take it to the state's attorney, and he thinking, there's no time limit here, and I'll just keep calling. He did start to call again, didn't he? No, he actually stopped calling. All together? He returned calls that Tushner made to him. I see, but- He stopped initiating any contact. And I think that- I'm curious as to why, if he thought he should let it die down, why he would make phone calls. Because if you're making phone calls, isn't that based upon the premise that you're supposedly trying to make buys? And if you are trying to avoid making buys because you want it to die down, why would you make phone calls? You aren't apparently discussing what the Bears did last weekend. You're discussing whether or not you do or you don't have a sale. And if he's quote-unquote told them that it should die down, why, what's the disadvantage, what's the non-benefit for him not calling, as opposed to returning phone calls? If I say I'm not interested in having my roof, you know, re-shingled, why should I call them a second time and say, I just want to let you know that I still don't want my roof re-shingled? I guess the thought would be that if one is facing six deliveries of heroin of a class X amount, one might have an interest in maintaining contact or maintaining contact as part of the discussion. And maintaining contact may well be, I have no reason to believe that things have not calmed down. But again, when one is facing six class X charges of heroin delivery, there might be an incentive to maintain contact. I like one's roof where you have no incentive to maintain contact with a vendor that you're not going to hire. Responding while reacting to phone calls is evidence of non-response is what you're telling us. Because you're taking a rather draconian viewpoint of the fact that, in your opinion at least, in order to make contact, it basically means that you actually have to make affirmative contacts as opposed to responding affirmatively. I think, you know, and again, we're looking at a situation where the defendant had a significant incentive to maintain contact and ultimately to see if he was going to be able to develop future sales. And the incentive is what? The incentive is based on the agreement that Detective Pulaski read. And if you say things are supposed to die down, how are you supposed to communicate that? Unless you're calling and saying, I would like to do some sales, but things haven't died down well enough, so I'm just calling in because I want to make sure that you understand that I'm still concerned, and please don't arrest me. Is that the kind of phone call he's supposed to make? I think maintaining contact would express continued interest, and I have to assume that the defendant had contacts and he could determine whether, in fact, things were dying down, and that would be something he would want to communicate to his handler. Is there any conversation or any testimony in this record that since the defendant was convinced that the street knew he had popped Mallard, that they went to now Judge Matthews in an effort to keep him off the street so he doesn't get hurt? Was there any testimony like that that occurred? No, there was not. And I think that in some respects, the feeling was perhaps that may have been part of the trigger of the arrest, that it was safer to have him off the street than not. But there wasn't any, I don't recall, a discussion in the record seriously about finding ways to protect him, because the man had a family, and in addition to protecting himself, there would also be a family to protect. And, again, the two named people that he talked about the first night of his arrest were, in addition to being significant drug dealers, were also significant members of street gangs in Lake County. And so to the extent that the defendant is concerned about his own safety after it became known that he had been involved in the Mallard thing, that's certainly a reasonable concern. You know, that aspect would not be unreasonable. But my recollection is that the record doesn't go into that much detail. Thank you. And as to the discussion about the surveillance, I don't think there was ever any pretext that the Illinois statute was complied with, because the entire operation with Ms. Bosco was under the auspices of the federal DEA. And to the extent that the defense position was that Ms. Bosco had not consented to surveillance activity, the fact that she agreed to wear a wire, the only way to view that is that she's consenting to surveillance, whether it's wearing a wire or whether it's having her car wired. But she was told not to touch anything in her car, which on some level I would think would give you notice that they had put something in her car as well. But I don't think any rational way to view her agreement would be that she was not consenting to participating in sales where surveillance would be part of the transaction. So insofar as the contract between her and the state, we're to give the state the benefit of the doubt. And that's based upon the fact that it's not in the agreement. It's implicit. And insofar as this defendant is concerned, with its agreement in the state, we're supposed to take anything that's not actually stated. And that is due in order to the benefit of the state. Because why? Because the agreement was specifically read to him verbatim before he signed it. And what it said was that if you, in fact, cooperate, we are not entitled to say that there will not be charges, but we will contact the state's attorney's office about it. And that's apparently an agreement that is used in these cases that was drafted by Illinois State Police. And that was read to the defendant prior to him signing it. So what you're saying, I gather, implicitly suggests that Agent Teshner or Officer Teshner had no authority, apparent, actual, or otherwise, to make any statement about working off the charges. They did, in fact, keep saying working off the charges, which was something that was a fairly ambiguous term. And they apparently believed that they could say it. But as to the agreement, any decision about whether to prosecute or what to prosecute would be made by the state's attorney's office. And the defendant was on notice of that. But they then charged all six, even though only, what, four of them were recorded? The other two weren't? Yes. And so the jury acquitted on the two that were not recorded and convicted on those that were. Did Officer, I mean, is working off kind of a, in the drug business, a term that people understand or does it have to be defined? Did Mr. Banks ever say, well, what does that mean? You know, I honestly don't know. I think that Mr. Banks assumed that the charges would go away, which in fairness is consistent with what the actual agreement was in Stupinsky. But that was not necessarily the agreement here. The agreement here, to the extent that there was an agreement, would be that if he provided two or three transactions of an equal or greater value, that that would be told to the state's attorney's office. And I think, I'm sorry? Finish, please. Oh, I'm sorry. No, I just mean finish answering the question. I don't want to sit down. That I think it would not be unreasonable for a defendant to assume that there would be consideration going with that agreement. The exact nature of the consideration might be a matter of dispute where the agreement specifically says it will only be up to the state's attorney to make that determination. But to the extent that a defendant did, in fact, deliver two to three transactions of an equal or greater value, it would not be stunning if the defendant anticipated some form of consideration to come from the state's attorney's office, though not necessarily from the officers. Who made the decision to arrest the defendant? Was it the state's attorney or was it Officer Teschner? I believe that Officer Teschner and DEA Agent Lancaster came to the conclusion that the state's attorney's office should be notified that they had not had initial contact from the defendant. So I assume it was the state's attorney's office that made the ultimate determination. Well, I don't want you to assume anything. The record is silent. What the record says is that Detective Teschner and DEA Agent Lancaster believed when the defendant had stopped initiating contact that they should get an arrest warrant. Did the police make any contact with the state before the arrest warrant was issued? I believe so.  I don't mean at the time the arrest warrant was issued. I'm referring to did they tell the state's attorney about what was going on with this particular defendant that they had charges pending, but he was working the charges off? I'm very sorry. I do not recall what was said about contact prior to the determination to seek a warrant. I apologize. And if there's any ambiguity in the agreement and the term working off the charges was Mr. Teschner's testimony, I believe? I believe it was Mr. Teschner's. I think it may have been also Detective Pulaski, but I'm not positive. But for sure Detective Teschner talked about it. And so if the term is ambiguous under contract law, we're supposed to presume that the ambiguity in order to the benefit of the person who either writes or states the ambiguity? I assume that that is true. No, it's not. Whoever writes a contract and, ergo, whoever, quote, unquote, makes an offer orally, if it's ambiguous, the law is that it's presumed to be interpreted against the person who supposedly initially wrote it or made the contract. And I misunderstood you because I thought that was what you just said. I apologize. No. What I said was if Officer Teschner was the one, on behalf of the State, we already know that the defendant claims that that's working off means non-prosecution. But assuming that Officer Teschner said the same thing, then he also orally agreed to it. And if I understand it correctly, the defendant wasn't the one that started this bargain or this contract. And so you're suggesting that under contract law, the allegation that Officer Teschner said that you're going to work off the charges should be interpreted to mean not non-prosecution or immunity. I guess. So, therefore, we're supposed to interpret it in favor of the State. The position that I would take is that if there was an agreement, it was that the defendant was going to deliver two to three transactions. The defendant did not deliver two to three transactions. He only delivered one. And the first one he attempted failed. And when his handler suggested trying that person again after the completed transaction, he declined because he believed that it was known that he had been involved in the successful transaction. So it wouldn't be a matter of saying that it would only be in favor of the State, but it would be that each side would have to meet what they had said they would meet. He had originally said he was going to deliver two very large drug dealers. Well, my question was directed, or my inquiry was directed, at your prior statement that the trial court found that there were inconsistent aspects of this agreement. Right. And as far as the trial court was concerned, that working the charges off didn't mean non-prosecution or immunity. I think if I understood the trial court's comments. So you responded with, yes, but he didn't comply with the rest of the contract, which was two out of three or one out of three or so on and so forth. And the point of my inquiry was you said there were inconsistencies that established that there wasn't an agreement when, in fact, the inconsistencies, there were no inconsistencies between Teschner and the defendant. And the inconsistency that the trial court came up with that related to whether or not it was prosecution, non-prosecution or immunity was that it was inconsistent. So if it's inconsistent, it has to be inconsistent not between the two witnesses, but between the trial court's lawful or question of law interpretation of what non-prosecution or what working the charges off means and non-prosecution or immunity. I believe that the trial court considered the discussions to be significantly ambiguous, that at different points in its discussion, it questioned whether there actually was an agreement. I would have to say if one assumes there was an agreement, it was agreement that was entered into the night of the defendant's arrest. There was no separate agreement. There was no separate agreement that was entered into later. Any other questions? Thank you. I think we've covered the subjects sufficiently. Good morning. Good morning. Mr. Reinhart. You may proceed. Thank you. The critical testimony in the case is found in the record between some of the questions that the court was asking, between pages 130 and pages 141. Teschner testified that he repeatedly used the phrase working off the charges with Banks in March and April of 2017. The agreement is between him and Teschner. Pulaski testified that he never spoke to Banks again. Teschner was not in the original meeting with the DEA and where Jason is giving statements against his interests and where he doesn't have a lawyer, which is different from Stupinsky, but actually weighs in Mr. Banks' favor that he didn't have a lawyer. The critical exchanges occurred between Teschner and Banks, and he admitted that he repeatedly used the phrase. And at page 141 of the record, Teschner said that he agreed that it meant that Banks would not be prosecuted. So is he interpreting this written agreement for Banks then? Teschner himself? Yes. I think Teschner was doing what we want officers to do, which is to work his sources. And I think Teschner and Banks had that relationship, and Teschner and Banks talked about working off the charges. Teschner said, quote, the charges that his understanding was, quote, the charges would go away. But that's not what the written agreement said in black and white. That's correct. That is correct. That is not what the written agreement said, and I really don't want to go too far down this path, but I'm happy to if the Court does. There's no parole evidence rule in the agreement. We've got a client who's been arrested at 4 a.m. We've got a defendant who's been arrested at 4 a.m. without a lawyer who's given this statement, who's given this document. He signs the document. He then gives a statement. So is the document tied to his statement? I mean his confession. He then gives a confession. Is his document about his confession, or is it about what's about to happen when they walk outside the door? The only person he speaks to after that night is Teschner. Teschner can form a new agreement. And isn't it interesting that they moved off of talking about his suppliers and moved to the runners. But Teschner said he was fine with that, and Teschner said at page 139 of the record that the targets were not to be specific. So perhaps Teschner did change the agreement. Maybe Pulaski and Lancaster wanted the big suppliers, and Teschner says, I'm okay with the runners. That's okay because Teschner does have authority to do these things. There's nothing in the written agreement that says, oh, and by the way, when you work with your handler, your handler can't change any of these terms. That is just not a practical or fair way to look at the situation. And I have to add this. Banks did not, on page 139 of the record, banks did not fail to return Teschner's calls. Teschner did not testify that a single time he called banks and didn't get a hold of banks. There's not a testimony that he sent 10 texts to banks and banks didn't return them. Did you disagree with counsel that it would have been his obligation, banks' obligation to stay in touch with Teschner? I completely disagree with what counsel said. I think that in this situation with Teschner, with them agreeing that it could die down and then Teschner essentially not calling him either or texting him, I will say the record does say that the texts were, that there were no texts that were ever preserved between the individuals. But Teschner does not say that I couldn't get a hold of him. Teschner doesn't say he stopped returning my calls. I think what everybody would expect is that maybe Teschner would say, oh, that phone number didn't work. That's different. That's not what happened here. And we have to focus on the time frame. I have to emphasize that, Justices. This is very compressed. This is early April to the third week of April that he says that he, that we're even talking about. Between, we don't even, Teschner doesn't even testify what the time frame was. Teschner doesn't say I didn't hear from him for 10 days. Teschner doesn't say I didn't hear from him for 20 days. Mallard is arrested in late March. They decide to let things die down because of Tracy. So now maybe they're working into April. And the arrest warrant is on April 24th. So it's that time frame which is so critical to the due process violation here. I have to comment on this non-consent issue. It is not, it is not right to say she, well, she must have known that some type of surveillance was occurring because she signed a document in January about consensual wearing and that something must have been going on. Dale v. Spears is a case which directly addresses an employee of a telephone company that thought they might be reporting her. This is, we're talking about cameras that led to the four convictions. And I appreciate the court understanding he was only convicted on the counts that involved the cameras. But that means that the jury, we can infer, that the jury didn't believe the confidential, didn't believe Brodsko when Brodsko was giving her own information. So we don't have a harmless error problem here. We have the jury doesn't believe Brodsko in two of the six, and the ones that are recorded, well, of course, they enter convictions on. So this illegally acquired evidence was obviously critical to Jason's conviction. I would respectfully ask that for the reasons set forth in the brief, that the court vacate the conviction in this case for due process violation or on the alternative that the court order a new trial with respect to the evidence that should have been suppressed. Was there any evidence in the record that indicated that Teschner contacted the State to inform the State of the progress and the agreement? There is no evidence in the record one way or the other. Do we know whether the arrest warrant was issued with or without the approval of the State's attorney's office? The specific, I do agree with counsel, but the specific phrasing was that Teschner and Lancaster went to get the warrant. I can tell you what the practice is in Lake County, but I can't tell you what the record is with respect to who they consulted or whether they consulted. Is there anything in the record wherein it indicates that Teschner discussed the possibility or the probability that the defendant might be given consideration by the State's attorney? You mean with the State's attorney's office? Yes. No, there's no record. No, there's no evidence that that occurred. And Pulaski's testimony, which I apologize I didn't have it earlier, is in page 209 of the record where he himself specifically describes the typical arrangement, which is whether charges would be filed or not. And then even this situation here, or if they could only do one case. Well, my point is, and I'm going to explain where I'm coming from so that you can qualify anything you wish to say, and that is that part of the agreement appears to be that the State, if it wasn't going to wash away the charges, that they would at least inform the State of the cooperation and the successes and failures and the totality of the circumstances so that the State could exercise some form of reasoned determination as to what kind of justice should be meted out in this particular situation. Is there anything in the record to indicate the State fulfilled that portion of their bargain? No. Thank you. Thank you. Thank you. Thank you. If we have other cases on the call, we will take short recess.